IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: : | |
| : | CASE NO. 5-11-bk-05194-RNO |
| JOHN C. LIENHARD, and : | |
| TREENA G. LIENHARD : | |
| : | CHAPTER 7 |
| Debtors : | |
| ********************************* : | ********************************* |
| TREENA G. LIENHARD : | |
| Plaintiff : | |
| v. : | |
| LEHIGHTON AMBULANCE : | |
| ASSOCIATION, INC. : | |
| Defendant : | ADVERSARY NO. 5-11-ap-00473-RNO |

## OPINION[1]

The instant Adversary Proceeding was brought by the Chapter 7 Debtor, Ms. Treena Lienhard ("Plaintiff" or "Debtor"), against the Defendant, Lehighton Ambulance Association, Inc. ("Defendant" or "Lehighton"), for alleged violations of the automatic stay and discharge injunction. A trial on the merits was held on February 22, 2013. For the reasons stated herein, I find that the Defendant did not willfully violate the stay pursuant to 11 U.S.C. § 362(k). Additionally, I find that the Defendant did not violate the discharge injunction pursuant to 11 U.S.C. § 524(a)(2).

**I.    Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b). This matter is a core

---

[1]    Drafted with the assistance of Joseph C. Barsalona II, Law Clerk.

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).

## II. Facts and Procedural History

John and Treena Lienhard filed their voluntary petition for Chapter 7 protection on July 26, 2011. The Chapter 7 Trustee reported to the Court that this was a no asset case on August 30, 2011, and they subsequently received their discharge on October 31, 2011.

Prior to their discharge being entered, the Plaintiff filed this Adversary Proceeding on her own behalf. Her Complaint, dated October 26, 2011, states a claim against the Defendant for a violation of the automatic stay pursuant to 11 U.S.C. § 362(k).[2] It alleges that the Defendant received notice of the Plaintiff's bankruptcy filing on July 30, 2011, as did the rest of her creditors. Pl.'s Compl. ¶ 7. Notwithstanding this notice, the Defendant mailed billing statements to the Debtor's residence on or about August 25, 2011 ("Bill 1"), and September 28, 2011 ("Bill 2"). *Id.* at ¶ 9. Upon receipt of Bill 1 and Bill 2, the Plaintiff alleges that she suffered the following damages: 1) anxiety; 2) nervousness; 3) fear; 4) worry; 5) intimidation; 6) emotional distress; and, 7) loss of income. *Id.* at ¶ 10.

Lehighton filed its responding paper, i.e. Answer, Affirmative Defenses, and Counterclaim of Defendant ("Answer"), on November 23, 2011. Among the affirmative defenses listed in the Answer, the Defendant claims it had no actual notice of the Lienhards' bankruptcy until October 6, 2011, a date after both bills were sent. Def.'s Answer 4. On this date, Plaintiff's counsel personally informed Lehighton of the bankruptcy filing. *Id.* at 5. Counsel gave notice in person because his office is allegedly "close to Defendant's place of

---

[2] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

2

Case 5:11-ap-00473-RNO    Doc 63    Filed 10/01/13    Entered 10/01/13 09:53:55    Desc
Main Document    Page 2 of 17

business." *Ibid.* Additionally, the Defendant claims to have discontinued all collection efforts once it received the notice of the bankruptcy filing on October 6, 2011. *Id.* at 6.

The Answer also includes a counterclaim which sought to reinstate a debt already discharged by this Court in the amount of $1,080.36. Lehighton provided an "advanced life support transport" to the Debtor on June 4, 2011. *Id.* at 7. An invoice for these services was sent to the Debtor's insurer. *Ibid.* Instead of paying Lehighton directly, the insurer forwarded a check to the Debtor on July 11, 2011, for the specific purpose of paying Lehighton. *Ibid.* The Defendant alleges that the Debtor converted the check upon receipt and failed to remit any portion to it. *Id.* at 8. Lehighton contends that the funds should have been held in trust for them and not discharged in Plaintiff's bankruptcy. *Ibid.*

On December 13, 2011, Plaintiff filed her response to the Answer: a Motion to Dismiss and Motion to Strike Defendant's Counterclaim ("Motion to Strike"). The Motion to Strike has a unique basis in that it claims the counterclaim, on its own, "is an attempt to collect a debt discharged in Debtor's bankruptcy." Def.'s Mot. to Strike ¶ 8. Hence, the Plaintiff contends that the mere filing of the counterclaim is in direct violation of the discharge injunction under § 524(a)(2), *id.* at ¶ 17, and thus, originates a contempt claim against the Defendant. Plaintiff filed a Motion for Contempt Citation and Damages ("Contempt Motion") in the Debtors' Chapter 7 case on that same day. The Contempt Motion alleges a violation of the discharge injunction on the same grounds given in the Motion to Strike and seeks the reward of damages and attorney's fees.

Defendant's answers to both the Motion to Strike and Contempt Motion were filed on January 9, 2012, in the Adversary Proceeding and the Chapter 7 case, respectively. Along with

3

Case 5:11-ap-00473-RNO    Doc 63    Filed 10/01/13    Entered 10/01/13 09:53:55    Desc
Main Document    Page 3 of 17

its general answers and denials to the statements made in the Motion to Strike, Lehighton defends its right to file the counterclaim on the same proposition as before: Lehighton has legal and equitable title to the funds from the insurer. Def.'s Answer to Pl.'s Mot. to Strike ¶¶ 5-6, 8-9, 14. The Defendant bases its argument on the fact that the counterclaim was only filed after the Plaintiff had filed the instant Adversary Proceeding; one day after the dischargeability claim deadline had run. *Id.* at ¶ 14. Up until notice of the Complaint, the Defendant was unaware of the payment by the insurer to the Debtor, and had no opportunity to compel its return; therefore, the argument goes, the counterclaim was the Defendant's first opportunity to assert its rights. *Id.* at ¶¶ 5, 14. In the alternative, Lehighton states that the counterclaim can be treated as a request for a relief from stay pursuant to the ruling in *Creative Conservation, Inc. v. Northern Lehigh School District (In re Creative Conservation, Inc.)*, No. 91-0734S, 1991 WL 261706 (Bankr. E.D. Pa. Dec. 5, 1991).

A few weeks later, the Defendant changed course and filed its Motion to Permit Amended Answer and Affirmative Defenses and to Withdraw Counterclaim. Filed with this Motion was a draft version of an amended answer which retained all affirmative defenses in the original Answer but removed the counterclaim language. Def.'s Mot. to Permit Am. Answer Ex. A. However, the "Wherefore clause" which originally followed the counterclaim remained in the paper. Its existence essentially prayed for the same relief notwithstanding the removal of the counterclaim grounds. The error in this filing led to the Plaintiff's filing another Motion to Strike the same day. Eventually, the Defendant filed an Amended Motion to Permit Amended Answer, on February 2, 2012, to correct the error.

At this point, the Court proposed mediation with the hope to bring the parties to a

4

mutually agreeable settlement. This effort bore no fruit as the Defendant filed correspondence on March 6, 2012, stating the parties agree that mediation "will serve little purpose." Def.'s Correspondence Regarding Mediation, Mar. 6, 2012. The Court Appointed Mediator filed a report stating same a few days later.

A trial on the merits was held on February 22, 2013. At the beginning of the hearing, all sides agreed to a consolidated record on both the Adversary Proceeding and the Contempt Motion. Trial Tr. 5:6-18. In addition, based on the parties' agreement, I entered an Order in the Adversary Proceeding granting leave to Defendant to amend its answer. Trial Tr. 7:20-24. This Order effectively replaces the original Answer with the Amended Answer proposed on February 2, 2012, which removes the counterclaim and the second wherefore clause from the text. Trial Tr. 7:24-25; 8:1.

The majority of this dispute's background facts are presented in the pre-trial briefs and to which I turn now before discussing oral testimony. The Defendant is a non-profit, 26 U.S.C. § 501(c)(3) charitable organization which provides life support and ambulance services in and surrounding Lehighton, Pennsylvania. Def.'s Trial Mem. 2. On June 4, 2011, Defendant transported Plaintiff's son from Gnaden Huetten Hospital to Lehigh Valley Hospital. *Id.* An invoice for these services was sent to Plaintiff's insurer on June 22, 2011. *Id.* Knowing that payment by the insurer would not be made to it directly, Lehighton sent an invoice for the services on July 7, 2011. *Id.* It is alleged that Plaintiff did in fact receive a check in the amount of $1,080.36 on or about July 11, 2011, from the insurer for the purpose of reimbursing Defendant. *Id.* at 3. However, the Plaintiff never remitted any of the funds to the Defendant and the present location of those proceeds is presently unknown. *Id.*

5

The invoice sent to Plaintiff, and the copies sent after she filed her Chapter 7 petition, are the root of the Adversary Proceeding and the Contempt Motion. The first witness to testify was Ms. Lienhard, the Plaintiff.

Ms. Lienhard works from her home as a sales representative for The Hartford. Trial Tr. 9:9-21. During the course of a regular work day, she interacts with prospective customers over the telephone. Trial Tr. 9:17-24. She signs into work by logging into her home computer and signing into the company's system. Trial Tr. 10:13-17.

The Plaintiff lives with her sister and her two sons, ages fourteen and five. Trial Tr. 11:10-11. Her eldest son suffers from spastic cerebral palsy which leaves him in need of constant assistance with his daily needs, such as eating or walking. Trial Tr. 11:17-23; 12:1-6. She, along with three employed health aides, assist the boy with his everyday activities throughout the week. Trial Tr. 12:17-25; 13:1-3. Her sister, Deann Lambert, is one of those health aides. Trial Tr. 13:4-9.

While working at home, the Plaintiff received Bill 1 from the Defendant on August 25, 2011. Trial Tr. 18:4-5. She described her reaction upon receiving the invoice as such: "I felt panic. I felt overwhelmed. I felt anxiety. I cried. And I felt nauseated and went to the bathroom and started to vomit." Trial Tr. 18:11-13. She testified to having a similar reaction when Bill 2 was received on September 28, 2011. Trial Tr. 19:2-7. She later testified under cross examination that the only time she vomited was the date of receipt of Bill 1, and she did not seek medical attention after suffering any of her alleged symptoms. Trial Tr. 41:11-25. The Plaintiff's sister, Deann Lambert, later corroborated the Plaintiff's symptoms upon receipt of Bill 1. Trial Tr. 84:1-3.

6

Due to her belief that her mood would have a potential negative effect on her work, the Plaintiff took the remainder of the work day off on August 25, 2011. Trial Tr. 19:10-22. Although she could not recall her hourly wage rate at the time of the incident, she testified that her current hourly wage is $15.57 per hour. Trial Tr. 20:21. She further stated that her hourly wages in 2011, i.e. at the time of receipt of both invoices, was "slightly less" than this amount. Trial Tr. 20:22-24.

During cross examination, the Plaintiff testified that the first invoice she received relating to the June 4, 2011, ambulance services for her son was received on July 7, 2011. Trial Tr. 36:6-8. Posted at the bottom of that invoice was a sticker that the Plaintiff read into the record which states in all capital letters: "PAYMENT WILL COME DIRECTLY TO YOU. PLEASE FORWARD THE PAYMENT AND A COPY OF THE EXPLANATION OF PAYMENT/ BENEFITS TO THE ADDRESS LISTED ABOVE." Trial Tr. 34:8-10; Def.'s Ex. 3. Plaintiff contends, in contrast to Defendant's pleadings, that she received the check from the insurer after she filed her bankruptcy petition. *Compare* Trial Tr. 36:17-25 (check received after bankruptcy filing), *with* Def.'s Answer 7 ("Plaintiff's insurer . . . forwarded reimbursement directly to Plaintiff on or about July 11, 2011 . . . ."). In any event, upon receipt, the Plaintiff cashed the check and "locked it in a safe deposit box." Trial Tr. 37:11-13.

After Ms. Lienhard cashed the check, the only other direct contact she had with the Defendant was Bill 1 which was sent on August 25, 2011. Trial Tr. 39:19-21. She did not call the Defendant after receiving the statement, she did not ask her lawyer to call the creditor, and she made no attempt to inform the ambulance company that she received the funds from the insurer. Trial Tr. 39:5-25. She also made no contact with the Defendant at the time of the

7

receipt of Bill 2, dated September 28, 2011. Trial Tr. 40:12-25.

On cross examination, the Plaintiff was also questioned on the hours of work she missed. While she does not remember the exact amount of hours missed, she admitted to only missing a couple of hours in the afternoon. Trial Tr. 47:4-16. Similarly, she had no recollection of the amount of work time missed, if any, on September 28, 2011. Trial Tr. 46:20-24.

The balance of the trial testimony focused on the mail procedures of the Defendant. The first witness in this regard was Ms. Ann Yeastedt, the office manager of Lehighton. Trial Tr. 50:15-17. She testified that the address listed on the Plaintiff's Section 341 meeting bankruptcy notice, i.e. Plaintiff's Exhibit 1, was incorrect in two ways: (1) the last four digits of the zip code; and, (2) the true name of the Defendant is "Lehighton Ambulance Association," whereas the notice only says "Lehighton Ambulance." Trial Tr. 52:22-25; 53:1-12; 54:8-13. Although Ms. Yeastedt is the primary person responsible for retrieving the mail, she testified to being away on vacation during the week in which the bankruptcy notice allegedly arrived in Defendant's mailbox. Trial Tr. 55:1-6.

As far as the actual procedures of the office, the mail is separated into two categories: "correspondence for patients or billing" and "bills that [are] owed." Trial Tr. 56:19-25. Ms. Yeastedt is responsible for all correspondence, and would have been in charge of the bankruptcy notice if and when it came to the Defendant. Trial Tr. 56:19-25; 57:1-17. All correspondence sent to the office is processed twice a week, but there is no procedure to confirm whether a client of Lehighton filed bankruptcy. Trial Tr. 62:4-10; 61:11-23.

When asked directly if she received the bankruptcy notice, or, to her knowledge, if anyone else in the office received it, she gave an unequivocal "no." Trial Tr. 68:2-19; 69:20-23.

In contrast, Ms. Yeastedt stated that she did not learn of the Plaintiff's bankruptcy until a letter came from Plaintiff's counsel, on October 5, 2011. Trial Tr. 68:2-11. In support of this statement, Ms. Yeastedt points to Exhibit M-5, a billing statement with personal comments typed at the bottom. Trial Tr. 64:17-25. These comments, which were later admitted into evidence without objection, state explicitly that the Defendant first learned of Plaintiff's bankruptcy filing upon receipt of the "threatening" letter by Plaintiff's attorney on October 5, 2011, and that no further statements will be sent to the Plaintiff thereafter. *See* Movant's Ex. 5 (Ms. Yeastedt's comments read: "[I] explained that we have not received the notice [Plaintiff's counsel] states was mailed to us . . . . [I] also added that we would cease sending statments [sic] at this point."). She also described the phone call between her and Plaintiff's counsel. During the conversation on October 5, 2011, Ms. Yeastedt stated that the Defendant's practice upon receipt of a bankruptcy notice is to cease sending statements and to write-off the debt immediately. Trial Tr. 71:12-25; 72:1-5. She also told Plaintiff's counsel, as well as the Court, that in her twenty years of working for the Defendant, she never received a call from an attorney seeking compensation for a stay violation. Trial Tr. 72:1-3.

Next, Ms. Yeastedt testified as to the Plaintiff's "Patient Summary Report." This report, admitted as Defendant's Exhibit 6, shows all of Lehighton's transaction history with the Plaintiff and her family. Trial Tr. 72:8-25; Def.'s Ex. 6. The final three entries are the most important to the case: they list the creation dates of the two statements at issue, followed by a transaction description from October 6, 2011, that reads "WRITE OFF TO BAD DEBT." Def.'s Ex. 6; Trial Tr. 73:21-25; 75:4-20.

After her conversation with Plaintiff's counsel, Ms. Yeastedt conducted a search of all

9

the Defendant's records to see if any bankruptcy notice existed. Trial Tr. 20-24. No such record was found. Trial Tr. 76:20-25; 77:1, 11-21. She stated that, had the bankruptcy notice been received, neither Bill 1 nor Bill 2 would have been sent. Trial Tr. 74:21-25; 75:1-25; 76:1-5, 16-19.

Therese O'Donnell was the next Lehighton employee to testify. She corroborated the fact that all bankruptcy notices go into the "correspondence" pile for mail. Trial Tr. 89:17-22. She also has specific knowledge of what an envelope from the bankruptcy court looks like, and knows to put it immediately in the "correspondence" pile for her supervisor (Ms. Yeastedt) to review. Trial Tr. 89:20-25; 90:4-13. Finally, she stated that the first time she was personally aware of Plaintiff's bankruptcy was on October 5, 2011, when Plaintiff's counsel's letter arrived via facsimile transmission. Trial Tr. 91:5-9.

The final witness was Ms. Joni Gestl, the administrator of Lehighton. Trial Tr. 93:14-18. It is her duty to pay the bills for the company and monitor the budget. Trial Tr. 93:19-23. Like the other Lehighton employees before her, she had no specific recollection of receiving the Plaintiff's bankruptcy notice. Trial Tr. 94:16-22. Furthermore, she too testified that she only learned about the Plaintiff's bankruptcy upon receipt of Plaintiff's counsel's letter on October 5, 2011. Trial Tr. 98:8-16.

The remainder of the trial consisted of proffers of evidence based on the discharge-injunction violation issue. Trial Tr. 111-121. As I have taken judicial notice of the docket entries, pursuant to Federal Rule of Evidence 201, a prolonged discussion of this evidence is not necessary at this time.

Both parties submitted post-trial briefs in lieu of closing argument. This case is now ripe

10

for disposition.

## III. Discussion

### A. Alleged Intentional Stay Violation Pursuant to 11 U.S.C. § 362(k)

A fundamental protection afforded to debtors under the Bankruptcy Code is the automatic stay. Under § 362(a)(6), "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" is stayed by the filing of a petition. For those instances where an entity does not abide by rules set forth in § 362, section 362(k) provides an independent cause of action for a variety of damages based on a "willful violation of the stay." 11 U.S.C. § 362(k)(1).

To succeed on a "willful" stay-violation claim, the debtor must prove: (1) a violation of the stay occurred; (2) the creditor had knowledge of the bankruptcy case when acting; and, (3) the violation caused actual damages. *Linsenbach v. Wells Fargo Bank (In re Linsenbach)*, 482 B.R. 522, 526 (Bankr. M.D. Pa. 2012); *Wingard v. Altoona Reg'l Health Sys. (In re Wingard)*, 382 B.R. 892, 900 (Bankr. W.D. Pa. 2008). A debtor must prove these elements by a preponderance of the evidence. *Wingard*, 382 B.R at 900 n.6 (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

#### i. Violation of 11 U.S.C. § 362(a)(6)

Here, the parties do not dispute that a stay violation occurred, and the Court agrees. Sending invoices to the Plaintiff on August 25, 2011, and September 28, 2011, was an "act to collect" a pre-petition claim by Defendant which is forbidden under § 362(a)(6). While they may only be "single-page invoices," Trial Tr. 41:1-2, their creation and receipt by the Debtor make them a stay violation nonetheless. Thus, the Plaintiff has proven the first element of the

11

test.

### ii. Lehighton Had No Knowledge of the Bankruptcy Filing

The major dispute in this case focuses on whether the Defendant had knowledge of the Plaintiff's bankruptcy case before mailing the invoices, thereby making the act "willful." A "deliberate action after having knowledge of the automatic stay" will suffice when proving a willful violation of a stay under § 362(k). *Thomas v. City of Philadelphia (In re Thomas)*, -- B.R. --, No. 13-0029, 2013 WL 4400428, at *10 (Bankr. E.D. Pa. Aug. 15, 2013) (citing *In re Lansdale Family Rests., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992)). In essence, mere "knowledge of the existence of the bankruptcy case" equates to knowledge of the stay. *Thomas*, 2013 WL 4400428, at *10.

To support her argument that the Defendant had knowledge of the bankruptcy case, the Plaintiff seeks to invoke the common law "mailbox rule." *See Rosenthal v. Walker*, 111 U.S. 185, 193, 4 S. Ct. 382, 386 (1884) (describing the general rule and the policy behind it). Under this rule, "proof of mailing raises a rebuttable presumption that the mailed item was received." *Carnathan v. The Ohio Nat'l Life Ins. Co.*, No. 1:06-CV-999, 2008 WL 2578919, at *3 (M.D. Pa. June 26, 2008) (citing *Samaras v. Hartwick*, 698 A.2d 71, 73 (Pa. Super. Ct. 1997)). Once established, the party challenging presumption of receipt must present credible evidence "demonstrating that the mailing was not in fact received." *Pondexter v. Allegheny Cnty. Hous. Auth.*, No. 11-857, 2012 WL 3611225, at *7 (W.D. Pa. Aug. 21, 2012) (citing *Harasty v. Pub. Sch. Employee's Ret. Bd.*, 945 A.2d 783, 787 (Pa. Commw. Ct. 2008)); *See also Cub Cadet Corp., Inc. v. Rosage (In re Rosage)*, 189 B.R. 73, 79 (Bankr. W.D. Pa. 1995) ("The presumption is rebuttable only by a showing that in reality the mailing was not accomplished.").

One form of evidence that has successfully been used to refute the mailbox-rule presumption of receipt is an office's procedures in handling the mail. *See, e.g.*, *In re Robinson*, 228 B.R. 75, 82 (Bankr. E.D.N.Y. 1998) (citing *In re Cassell*, 206 B.R. 853, 857 (Bankr. W.D. Va. 1997)) ("Although the mere denial of receipt does not rebut the presumption, testimony denying receipt in combination with evidence of standardized procedures for processing the mail can be sufficient to rebut the presumption."); *In re Hobbs*, 141 B.R. 466, 468 (Bankr. N.D. Ga. 1992) (citing *Merrill Lynch v. Dodd (In re Dodd)*, 82 B.R. 924, 929 (Bankr. N.D. Ill. 1987) ("[D]irect testimony of nonreceipt, particularly in combination with evidence that standardized procedures are used in processing claims, . . . [is] . . . sufficient to support a finding that the mailing was not received, and thereby rebut the presumption accorded a proper mailing."); *Baldwin v. Bd. Of Chiropractors*, 79 P.3d 810, 812 (Mont. 2003) (court not persuaded where "mail handling protocols or other office procedures" not presented by addressee on issue of nonreceipt); *Elec. Servs. Int'l, Inc. v. Silvers*, 233 A.D.2d 361, 362 (N.Y. App. Div. 1996) (affidavits from employees describing "strict procedures" for placement of notices enough to rebut presumption of receipt).

Furthermore, rebutting the presumption of receipt is an issue of fact which is decided on the evidence presented. *Rendina v. Northrop*, 399 B.R. 376, 380 (D. Vt. 2008) (citing *In re Eagle Bus. Mfg., Inc.*, 62 F.3d 730, 735 (5th Cir. 1995)). It is well-settled law in this circuit that a "strict evidentiary standard—a strong presumption—applies only when a notice . . . is sent by *certified* mail, and that a weaker presumption of receipt applies when such a notice is sent by *regular* mail." *Santana Gonzalez v. Attorney General of U.S.*, 506 F.3d 274, 279 (3d Cir. 2007) (emphasis in original). As the bankruptcy notice in this case was sent by regular mail, the

13

weaker evidentiary standard applies.

In the case at bar, I find that the Defendant successfully met its burden and rebutted the presumption of receipt by providing the following evidence to the Court: (1) written proof of the imprecise address of the Defendant as listed on the bankruptcy notice; (2) unrebutted oral testimony from three credible witnesses on the non-receipt of the notice and of the general mail-handling office procedures of the Defendant; and, (3) personalized notes transcribed when the witnesses first learned of the bankruptcy.

First, the Defendant raised doubt over whether the bankruptcy notice was delivered to it by showing the deficiencies in the bankruptcy notice. As Ms. Yeastedt testified, the name of the defendant was incorrect: the notice said "Lehighton Ambulance" although the technical name of the Defendant is "Lehighton Ambulance Association." Trial Tr. 54:8-13. Also, the last four digits of the Defendant's alleged zip code were incorrect. Trial Tr. Trial Tr. 53:1-4. Looking at these two facts, it is conceivable that the bankruptcy notice was not delivered to Lehighton; a doubt that aids the Defendant in rebutting the presumption of receipt.

Next, and most supportive of Defendant's case, was the testimony by the three employees of Lehighton. These are the only individuals responsible for mail handling in the entire company, and all three of them categorically denied ever receiving the bankruptcy notice. Trial Tr. 68:9-11; 91:5-9; 100:15-17. They also described the specific office protocols for handling the mail on the record. Trial Tr. 56:7-25. Because of this persuasive testimony provided by the Defendant, I find that it has successfully met its burden of rebutting the mailbox rule's presumption of receipt. My finding that all three witnesses appeared to be credible and truthful strengthens this result.

14

Finally, the written notes on Exhibit M-5 further corroborate Defendant's statement that the bankruptcy notice was never received. The notes give a clear description, as transcribed by Ms. Yeastedt, of the office's response upon learning of the bankruptcy filing on October 5, 2011, more than two months after the petition date. Trial Tr. 64:17-25; 65:5-15. Plaintiff did not challenge the authenticity of the document; in fact, she was the party that admitted it into evidence. I find this document definitively shows that the Defendant learned of the bankruptcy filing only after Plaintiff's counsel's letter. This finding is supported by the Plaintiff's Patient Summary Report, Exhibit D-6, which presents the same dates on a more formal document.

I recognize the continuing need for the mailbox rule, particularly in bankruptcy where nearly all notices and summonses are sent by mail. However, the mailbox rule is not absolute. It only creates a rebuttable presumption of delivery which, as seen here, can be defeated. In sum, the substantial amount of evidence presented by the Defendant successfully rebuts the presumption of the receipt of the July 30, 2011, bankruptcy notice. Thus, I find that the Defendant had no knowledge of the bankruptcy filing when sending the billing statements and therefore did not willfully violate the automatic stay.

### iii. No Damages Will Be Awarded

It has long been held that "technical and unintended" violations of the automatic stay do not warrant the imposition of monetary damages. *Brown v. Penn. State Emps. Credit Union (In re Brown)*, 49 B.R. 558, 560 (Bankr. M.D. Pa. 1985). Here, without the Defendant's knowledge of the bankruptcy filing, a similar result follows.

I also note that the Plaintiff, or her counsel, could have easily sent a cease-and-desist letter, by regular or certified mail, to the Defendant after receipt of Bill 1 or Bill 2 to prevent

15

further distress and prevent litigation. Hand delivery of a cease-and-desist letter could also have been easily accomplished. None of these actions were taken here.

B. **Alleged Discharge Injunction Violation Pursuant to 11 U.S.C. § 524(a)(2)**

A discharge in bankruptcy creates an injunction which protects the debtor from any personal liability on a discharged debt. *In re Antonious*, 373 B.R. 400, 406 (Bankr. E.D. Pa. 2007) (citing *Matter of Paeplow*, 972 F.2d 730, 733 (7th Cir. 1992)). Unlike a willful violation of the stay, the Code does not provide an explicit statutory private right of action to enforce the injunction. *Antonious*, 373 B.R. at 407. As a result, bankruptcy courts turn to the common law remedy of civil contempt to enforce the discharge injunction. *See, e.g.*, *id.*; *In re McNeil*, 128 B.R. 603, 607 (Bankr. E.D. Pa. 1991).

To find a violation of the discharge injunction, clear and convincing evidence must show (1) a valid order of the court existed; (2) the defendant had knowledge of the order; and, (3) the defendant disobeyed the order. *Cal. Coast Univ. v. Aleckna (In re Aleckna)*, 494 B.R. 647, 654 (Bankr. M.D. Pa. 2013); *In re Meyers*, 344 B.R. 61, 65 (Bankr. E.D. Pa. 2006).

From the facts presented, and based on the equities of this case, I cannot find that Defendant's action—in filing the ultimately withdrawn counterclaim—was contemptuous. First, I have already held that the Defendant had no knowledge of the bankruptcy case until October 5, 2011. With no knowledge of the case it had no opportunity to present defenses or assert additional claims but for its answer. Although it is the law of this circuit that the claims bar date is a strict statute of limitations for filing claims, *Althouse v. RTC*, 969 F.2d 1544, 1545 (3d Cir. 1992), I refuse to expand that doctrine to make contemptuous the mere raising of such a claim in a responsive pleading.

16

This holding is further supported by the fact that the Defendant withdrew the counterclaim. By doing so, I find the Defendant has purged itself of any civil contempt claims. *See Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 114 S. Ct. 2552, 2558 (1994) ("[T]he contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.").

## IV. Conclusion

For the reasons stated above, I find that Lehighton Ambulance Association, Inc. did not willfully violate the automatic stay under 11 U.S.C. § 362(k). I also find that the Defendant did not violate the discharge injunction pursuant to 11 U.S.C. § 524(a). An Order will be entered consistent with the foregoing Opinion.

By the Court,

_____
Robert N. Opel, II, Bankruptcy Judge
(BI)

Date: September 30, 2013